**BOSSIER CHRYSLER DODGE II, INC., d/b/a Bossier Country, Appellant,**

v.

**Bryan RAUSCHENBERG, Appellee.**

No. 10–05–00140–CV.

Court of Appeals of Texas, Waco.

June 14, 2006.

Rehearing Overruled Aug. 22, 2006.

J. Bruce Bennett, Cardwell Hart & Bennett LLP, William R. Crocker, Austin, for Appellant.

Brandon Belt, Gatesville, for Appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

Bryan Rauschenberg filed suit against Bossier Chrysler Dodge II, Inc. dba Bossier Country alleging DTPA violations, breach of express and implied warranties, and breach of contract, all arising from his purchase of a diesel pickup from Bossier Country. A jury found in favor of Rauschenberg and awarded actual damages of $8,412, additional damages of $5,000, and attorney's fees. Bossier Country presents thirteen issues for review. We will affirm in part, reverse and render in part, and suggest a remittitur.

Bossier Country contends in its issues that:

- Rauschenberg lacks standing or is not entitled to recover in his individual capacity;

- there is no evidence or factually insufficient evidence to support the jury's award for (a) lost profits, (b) loss of use of the truck, (c) the reasonable value of Rauschenberg's time attempting to correct the problems with the repair of the truck, and (d) out-of-pocket expenses; (four issues)

- there is no evidence or factually insufficient evidence that Bossier Country engaged in the deceptive trade practices alleged;

- Rauschenberg disclaimed all warranties as a matter of law;

- there is no evidence or factually insufficient evidence that Bossier City failed to comply with any express or implied warranty;

- there is no evidence or factually insufficient evidence that Bossier City intentionally or knowingly engaged in the deceptive trade practices alleged; (two issues);

- there is no evidence or factually insufficient evidence to support the jury's award of additional damages;

- Rauschenberg is not entitled to attorney's fees because he failed to prove the alleged DTPA violations; and
- the attorney's fee award must be modified because there is no evidence or factually insufficient evidence to prove all or part of the damages awarded.

## Factual Background

Rauschenberg purchased a 2001 Dodge 3500 diesel pickup from Bossier Country in May 2000. He also purchased an extended service contract for the pickup which provided some coverages for up to 60 months or 100,000 miles.[1]

Rauschenberg bought the truck for his son Kelly to use in a "hot-shotting" business.[2] Rauschenberg made the monthly payments on the truck with money Kelly gave him from hot-shotting receipts.[3] They agreed that Kelly would keep all monthly net receipts above and beyond the monthly truck payment until Kelly had satisfied some other debts he owed. After that, they intended to share the net receipts equally.

The truck worked well for them with relatively few problems until November 2000. During a delivery to North Carolina, Kelly noticed that the pickup was using an excessive amount of oil. He took it to a dealership in Alabama where it was determined that the front seal was leaking. Kelly returned to Texas, checking and replenishing the oil regularly along the way

as recommended. Kelly then took the pickup to Bossier Country for repair. A Bossier Country mechanic concluded that the problem lay with the turbocharger. After consulting with the engine manufacturer, the mechanic replaced the turbocharger and other parts and completed the job six days after Kelly brought the pickup in.

Rauschenberg testified that the pickup still had an oil leak when he brought it home and that it could not pull a trailer. He returned the pickup to Bossier Country on December 26 complaining that it had an oil leak and an engine knock, was blowing blue smoke, and was getting "5 mph loaded—10 empty."[4] Bossier Country replaced the injector pump and recommended that the fuel system be flushed because it was dirty. The mechanic's handwritten notes indicate that oil on the front of the motor was from the breather trap, which needed cleaning. However, there is nothing in the service record to indicate that this was done. Rauschenberg declined Bossier Country's suggestion that the fuel system be flushed. The repairs were completed on January 3.

Rauschenberg testified that the pickup was still leaking oil after these repairs. He returned it to Bossier Country for the last time on January 11. This time, he complained that it had an oil leak and an engine knock and was running rough. Bossier Country prevailed this time in the

---

1. The pickup came with a 3 month/3,000 mile limited warranty. The extended service contract provided additional coverage of 60 months/50,000 miles for the emissions system and 60 months/100,000 miles for corrosion perforation and for the diesel engine.

2. Rauschenberg bought the truck because Kelly was having financial difficulties at the time. Rauschenberg explained that the "hot-shotting" business involved hauling trailers and vehicles on a gooseneck trailer to loca-

tions throughout the continental United States.

3. Rauschenberg also made the insurance payments for the truck, but there is no indication in the record that Kelly gave him any money for this expense.

4. It is unclear whether this is a reference to the Rauschenberg's complaint at trial that the pickup "wouldn't pull" or a reference to poor fuel economy (i.e., mpg).

recommendation to flush the fuel system. The mechanic determined that the pickup was leaking oil around the front engine seal and replaced it. Bossier Country spent several weeks making repairs. Afterward, the engine was steam cleaned, and no additional oil leaks were detected.

Bossier Country notified Rauschenberg on Friday, February 2 that the pickup was ready. He came the next day, although Bossier Country's regular business hours are Monday through Friday. No one was there to release the pickup to him. Bossier Country called Rauschenberg twice the following week offering to deliver the pickup to him in Gatesville, about 100 miles from the dealership,[5] but Rauschenberg did not respond to these offers and left the pickup at Bossier Country.

Rauschenberg filed a lemon-law complaint in April seeking repurchase of the pickup by Bossier Country.[6] At some point however, it was determined that Rauschenberg's only option was to have the pickup repaired by another dealer, apparently because he did not file his complaint within six months after the pickup had been driven 24,000 miles.[7] Rauschenberg retrieved the pickup from Bossier Country in early July. He testified that the pickup continued to leak oil and not run well. At DaimlerChrysler's suggestion, Rauschenberg took the pickup to a dealership in Killeen for repair on July 24. The Killeen dealership did extensive work on the engine and determined that it was leaking from a cracked timing cover housing. Repairs were completed, and the pickup was returned to Rauschenberg three days after he took it there.

Rauschenberg drove the pickup for several days and determined that the engine was "still leaking [oil] a little bit." He returned it to the Killeen dealership on August 1. The dealership identified two additional places where the engine was leaking oil and repaired them. The pickup was returned to Rauschenberg on August 3. By this time, Rauschenberg was "fed up" with the pickup and traded it in.

## Procedural Background

Rauschenberg's petition alleges that Bossier Country committed the following DTPA laundry-list violations:

- represented that goods or services were of a particular standard, quality, or grade, or that goods were of a particular style or model, when they were of another;
- knowingly made false or misleading statements of fact concerning the need for parts, replacement, or repair service; and
- represented that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced.

See TEX. BUS. & COM.CODE ANN. § 17.46(b)(7), (13), (22) (Vernon Supp. 2005).

The petition alleges that Bossier Country breached implied warranties of fitness for a particular purpose and of good and workmanlike performance and breached the extended warranty which Rauschen-

---

5. Bossier Country is located in Fairfield.

6. See Act of May 25, 1991, 72d Leg., R.S., ch. 501, § 23, 1991 Tex. Gen. Laws 1749, 1761–62 (former TEX.REV.CIV. STAT. art. 4413(36), § 6.07(c)) (repealed 2001) (current version at TEX. OCC.CODE ANN. § 2301.604 (Vernon 2004)).

7. See Act of May 25, 1991, 72d Leg., R.S., ch. 501, § 23, 1991 Tex. Gen. Laws 1749, 1763 (former TEX.REV.CIV. STAT. art. 4413(36), § 6.07(h)) (repealed 2001) (current version at TEX. OCC.CODE ANN. § 2301.606(d)(2) (Vernon 2004)).

berg purchased when he bought the pickup. The petition also alleges a general claim for breach of contract.[8]

Bossier Country responded with a general denial and with a verified denial that Rauschenberg was entitled to recover in his individual capacity.

The jury found in Rauschenberg's favor on all theories submitted. The jury awarded actual damages of: $2,100 for loss of use of the pickup; $5,000 for lost profits; $1,000 for the reasonable value of Rauschenberg's time used while attempting to have the pickup repaired; and $312 for out-of-pocket expenses. The jury awarded additional damages of $5,000 because it found that Bossier Country acted intentionally and knowingly. Finally, the jury awarded attorney's fees of: $6,750 for trial; $2,500 for an appeal to this Court; and $2,500 for an appeal to the Supreme Court.

### Standing

Bossier Country contends in its first issue that Rauschenberg does not have standing to pursue the claims asserted in his petition.

■■■ Standing is generally a question of law which we determine by review of the factual allegations of the plaintiff's pleadings. *See West v. Brenntag Sw., Inc.*, 168 S.W.3d 327, 334 (Tex.App.-Texarkana 2005, pet. denied); *MET-Rx USA, Inc. v. Shipman*, 62 S.W.3d 807, 809–10 (Tex. App.-Waco 2001, pet. denied). We construe the pleadings in favor of the plaintiff. *See West*, 168 S.W.3d at 334; *MET-Rx USA*, 62 S.W.3d at 810.

■■■ A plaintiff must be a "consumer" to maintain a DTPA suit. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 386 (Tex.2000); *Bynum v. Prudential Residential Servs., Ltd. P'ship*, 129 S.W.3d 781, 792 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *Cook–Pizzi v. Van Waters & Rogers, Inc.*, 94 S.W.3d 636, 644 (Tex.App.-Amarillo 2002, pet. denied). The DTPA defines a "consumer" in pertinent part as "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM.CODE ANN. § 17.45(4) (Vernon 2002); *see also Crown Life Ins. Co.*, 22 S.W.3d at 386; *Cook–Pizzi*, 94 S.W.3d at 644. To have standing then, a DTPA plaintiff must be one who has purchased or leased goods or services, and the goods or services must form the basis of the plaintiff's complaint. *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 572 (Tex.App.-Austin 2003, no pet.); *Bohls v. Oakes*, 75 S.W.3d 473, 479 (Tex.App.-San Antonio 2002, pet. denied); *Jones v. Star Houston, Inc.*, 45 S.W.3d 350, 356 (Tex. App.-Houston [1st Dist.] 2001, no pet.).

■■■ Rauschenberg's petition alleges (and the evidence shows) that he purchased the pickup from Bossier Country and had Bossier Country's service department perform repairs on the pickup. Thus, he is a "consumer" as defined by the DTPA. *See* TEX. BUS. & COM.CODE ANN. § 17.45(4); *Houston Livestock Show & Rodeo*, 125 S.W.3d at 573; *Bohls*, 75 S.W.3d at 479; *Jones*, 45 S.W.3d at 356. The allegations of Rauschenberg's petition concern the manner in which Bossier Country repaired or failed to repair the

---

**8.** Although Rauschenberg alleged breach of contract in his petition, he did not request the submission of a jury question on this theory of recovery. Thus, he effectively non-suited his breach of contract claim. *Cf. Alvarez v.*

*Thomas*, 172 S.W.3d 298, 300–01 (Tex.App.-Texarkana 2005, no pet.) (omission of defendant from amended petition effectively non-suits claims against omitted defendant).

pickup and the manner in which Bossier Country fulfilled or failed to fulfill representations it's employees allegedly made to Rauschenberg regarding the pickup and Bossier Country's service department. Thus, the goods and services Rauschenberg purchased from Bossier Country form the basis of his complaint. *See Houston Livestock Show & Rodeo*, 125 S.W.3d at 573; *Jones*, 45 S.W.3d at 356–57. Accordingly, Rauschenberg has standing to pursue the DTPA claims alleged in his suit.

■ To have standing to sue for breach of express or implied warranties for goods, the plaintiff must be a "buyer" of those goods as that term is defined by the UCC. *See DaimlerChrysler Corp. v. Inman*, 121 S.W.3d 862, 882 (Tex.App.-Corpus Christi 2003, pet. granted).[9] Section 2.103(a)(1) of the Business and Commerce Code (the Texas UCC) defines a "buyer" as a "person who buys or contracts to buy goods." TEX. BUS. & COM.CODE ANN. § 2.103(a)(1) (Vernon Supp.2005). Rauschenberg's petition alleges (and the evidence shows) that he purchased the pickup from Bossier Country. Thus, he has standing to sue for breach of any express or implied warranties arising from the purchase of the pickup. *See Daimler-Chrysler Corp.*, 121 S.W.3d at 882.

We apply the same rule to determine whether a plaintiff has standing to sue for breach of the implied warranty of good and workmanlike performance for services rendered. Thus, such a plaintiff must have been the one who procured the ser-

vices rendered. *See DaimlerChrysler Corp.*, 121 S.W.3d at 882. Here, the petition alleges (and the evidence shows) that Rauschenberg procured the repair services at issue from Bossier Country. Thus, he has standing to sue for breach of the implied warranty of good and workmanlike performance of the services rendered.

### Capacity to Sue

The remainder of Bossier Country's first issue is addressed to the question of whether Rauschenberg is entitled to recover in his individual capacity because his son and he allegedly formed a partnership and the claims asserted in this lawsuit belong to the partnership. Rauschenberg denies the existence of a partnership.

■ The issue of capacity to sue must be raised by a verified pleading filed in the trial court. TEX.R. CIV. P. 93(1), (2); *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex.2005). Traditionally, this issue is raised by a verified plea in abatement. *See, e.g., Byrd v. Est. of Nelms*, 154 S.W.3d 149, 154 (Tex.App.-Waco 2004, pet. denied); *M & M Constr. Co. v. Great Am. Ins. Co.*, 747 S.W.2d 552, 554 (Tex.App.-Corpus Christi 1988, no writ); *Bluebonnet Farms, Inc. v. Gibraltar Sav. Ass'n*, 618 S.W.2d 81, 83 (Tex.Civ. App.-Houston [1st Dist.] 1980, writ ref'd n.r.e.); *see also* 2 ROY W. MCDONALD & ELAINE A. GRAFTON CARLSON, TEXAS CIVIL PRACTICE § 9.13 (2d ed.2002). However, the issue of capacity may also be raised by a verified denial.[10] *See Pledger v. Schoellkopf*, 762 S.W.2d 145, 145–46 (Tex.1988);

---

9. The Supreme Court has granted review on issues relating to the plaintiffs' standing as putative class representatives. *See Daimler-Chrysler Corp. v. Inman*, No. 03–1189, 48 Tex. Sup.Ct. J. 154, 154–55 (Tex. Dec. 3, 2004) (order granting review).

10. It appears that the use of a verified denial in the context of capacity to sue is most

appropriate when the plaintiff has alleged the existence of a corporation or partnership or that the plaintiff is doing business under an assumed name or trade name and the defendant disputes this allegation. *See* TEX.R. CIV. P. 93(5), (6), (14); 2 ROY W. MCDONALD & ELAINE A. GRAFTON CARLSON, TEXAS CIVIL PRACTICE §§ 9.36, 9.39, 9.41 (2d ed.2002).

*McMillan v. Dooley,* 144 S.W.3d 159, 171 (Tex.App.-Eastland 2004, pet. denied); *Anderson v. New Prop. Owners' Ass'n of Newport, Inc.,* 122 S.W.3d 378, 383 (Tex. App.-Texarkana 2003, pet. denied). The difference in these two procedural mechanisms appears to lie in the manner by which the party challenging capacity obtains a ruling from the trial court on that complaint. *See War–Pak, Inc. v. Rice,* 604 S.W.2d 498, 503 (Tex.Civ.App.-Waco 1980, writ ref'd n.r.e.) (even though plaintiff's capacity challenged by sworn pleading, matter not preserved because it was never ruled on by trial court).

■ If a verified plea in abatement is filed, the filing party should seek a hearing on the plea. If the plea is overruled, then the matter has been preserved for appellate review. *See War–Pak,* 604 S.W.2d at 503. If the plea is sustained however, "the trial court should abate the case and give the plaintiff a reasonable time to cure any defect." *Austin Nursing Ctr.,* 171 S.W.3d at 853 n. 7. Should the plaintiff fail to cure the defect, then the court may dismiss the suit with prejudice. *See M & M Constr. Co.,* 747 S.W.2d at 555; 2 McDONALD & CARLSON, § 9.13.

■ Conversely, if a verified denial is filed, the issue of the plaintiff's capacity to sue is controverted, and the plaintiff bears the burden of proving at trial that he is entitled to recover in the capacity in which he has filed suit. *Cf.* 2 McDONALD & CARLSON, § 9.41 ("A properly verified denial [of an alleged partnership] imposes on the plaintiff the burden of proving the alleged partnership"). As the party with the burden of proof then, it is incumbent upon the plaintiff to obtain a jury finding on this particular issue.

■ If, however, the trial court submits a question assuming the capacity originally pleaded (*e.g.,* a question on what

damages the plaintiff as an individual suffered because of the defendant's deceptive trade practices) and the defendant does not object to the question, then the defendant is bound by that charge on appeal. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000); *O'Connor v. Miller,* 127 S.W.3d 249, 254 (Tex.App.-Waco 2003, pet. denied). Conversely, if the defendant does object, then the defendant will either obtain the sought-after jury finding or have an adverse ruling which can be reviewed on appeal.

■ Here, Bossier Country's verified denial properly controverted the issue of whether Rauschenberg is entitled to recover in his individual capacity. However, Bossier Country did not object to the absence in the court's charge of any questions, definitions, or instructions on the issue of capacity. Rather, Bossier Country's trial counsel argued in part that the jury should not award Rauschenberg any damages because his son, if anyone, was the person who lost money as a result of the problems with the pickup. Bossier Country did assert in its motion for new trial that Rauschenberg "lacked standing or capacity" to recover the damages awarded. However, this assertion of the issue of Rauschenberg's capacity was not made in a timely fashion. *See Brown v. Pittsburgh Corning Corp.,* 909 S.W.2d 101, 104 (Tex.App.-Houston [14th Dist.] 1995, writ denied); *De La Garza v. Salazar,* 851 S.W.2d 380, 383 (Tex.App.-San Antonio 1993, no writ).

In summary, although Bossier Country properly filed a verified denial on the issue of whether Rauschenberg is entitled to recover in the capacity in which he sued, Bossier Country has not preserved the issue of Rauschenberg's capacity for appellate review because Bossier Country did not object to the absence in the court's charge of any questions, definitions, or in-

structions on the issue of capacity. *Cf. War–Pak,* 604 S.W.2d at 503. To the extent that Bossier Country argued at trial that the claims asserted belong to Rauschenberg's son rather than to Rauschenberg himself, the issue is not preserved because Bossier Country's theory at trial was different than the theory asserted on appeal. *See In re C.Q.T.M.,* 25 S.W.3d 730, 738 (Tex.App.-Waco 2000, pet. denied).

Because Rauschenberg has standing and because Bossier Country has not properly preserved the issue of Rauschenberg's capacity, we overrule Bossier Country's first issue.

### Standards of Review

When we conduct a no-evidence review, we must determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.*

"Under traditional factual sufficiency standards, a court determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias." *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002). If we conclude that the evidence is factually insufficient, we must "detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003) (quoting *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986)). Further, we must "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Id.*

### DTPA Laundry–List Violations

Bossier Country contends in its sixth issue that there is no evidence or factually insufficient evidence that it committed any of the laundry-list violations alleged. Rauschenberg's allegations are that Bossier Country:

- represented that goods or services were of a particular standard, quality, or grade, or that goods were of a particular style or model, when they were of another;
- knowingly made false or misleading statements of fact concerning the need for parts, replacement, or repair service; and
- represented that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced.

*See* TEX. BUS. & COM.CODE ANN. § 17.46(b)(7), (13), (22).

#### (1) representations about promptness of repairs—sec. 17.46(b)(7)

Rauschenberg testified that he explained to a Bossier Country salesperson that he needed assurances that the pickup would be promptly repaired "if it had a breakdown" to ensure the success of the hot-shotting business. Several representations were made to him about Bossier Country's service department and the promptness of its repair work.

The salesperson "assured [Rauschenberg] personally," "Oh, we'll get it done, we'll get it fixed, we'll get it right back out on the road."

When Rauschenberg asked how long repairs usually took, he was told, "It's

according to what the problem is but normally from one to three days." It was acknowledged "that you might have some problems that would take a little longer, but ordinarily ..."

Rauschenberg testified that, based on these representations, he was led to believe "[t]hey'd get it in and get it out."

Rauschenberg contends that these were actionable misrepresentations because he took the pickup to Bossier Country three times to repair the oil leak, but it was still leaking oil even after the third attempt to repair it. He also notes that Bossier Country kept his pickup more than twenty days on its third attempt to repair the oil leak.

■ Bossier Country responds that these representations are merely puffing which is not actionable under section 17.46(b)(7). Bossier Country is correct that "mere puffing" is not actionable under this provision. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 502 (Tex.2001); *Humble Nat'l Bank v. DCV, Inc.,* 933 S.W.2d 224, 229 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *Hedley Feedlot, Inc. v. Weatherly Trust,* 855 S.W.2d 826, 838–39 (Tex.App.-Amarillo 1993, writ denied); *see also Munters Corp. v. Swissco–Young Indus., Inc.,* 100 S.W.3d 292, 298 (Tex.App.-Houston [1st Dist.] 2002, pet. dism'd) (puffing not actionable under section 17.46(b)(5)).

■ Three factors are considered in determining whether a representation is "mere puffing": (1) the specificity of the representation; (2) the comparative knowledge of the buyer and seller; and (3) whether the representation relates to a future event or condition. *Munters Corp.,* 100 S.W.3d at 298; *Humble Nat'l Bank,* 933 S.W.2d at 230; *Hedley Feedlot,* 855 S.W.2d at 839; *Autohaus, Inc. v. Aguilar,* 794 S.W.2d 459, 462–64 (Tex.App.-Dallas

1990), *writ denied,* 800 S.W.2d 853 (Tex. 1991) (per curiam).

■ A review of these particular representations convinces us that they are too general to be actionable. None of the statements guarantees a precise timeframe for completion of repairs. In fact, the last statement acknowledges that some problems take longer to repair than the "one to three days" "normally" required. This acknowledgement renders the statements too indefinite to be actionable. *See Bradford v. Vento,* 48 S.W.3d 749, 759 (Tex. 2001); *Autohaus,* 794 S.W.2d at 464–65.

Because these statements are too indefinite to be actionable, we hold that there is no evidence in the record which "would enable reasonable and fair-minded people" to find that Bossier Country made a misrepresentation under section 17.46(b)(7). *Wilson,* 168 S.W.3d at 827.

**(2) representations about need for repairs—sec. 17.46(b)(13)**

■ Rauschenberg contends that, because he took the pickup to Bossier Country three times to repair the oil leak and because Bossier Country tried but failed to repair the leak on each occasion, Bossier Country necessarily "made false or misleading statements of fact concerning the need for parts, replacement, or repair service."

On the first occasion, Bossier Country determined that the turbocharger was the cause of the oil leak. In addition, Bossier Country repaired the clutch in response to Rauschenberg's complaint. Rauschenberg does not contend (and there is no evidence to suggest) that either of these repairs was unnecessary.

On the second occasion, Bossier Country recommended that the injector pump be replaced and the fuel system flushed to make the engine run smoothly and at full

power. Bossier Country concluded that the breather trap needed cleaning to resolve the problem with oil on the front of the engine. Rauschenberg does not contend (and there is no evidence to suggest) that any of these repairs was unnecessary.

On the last occasion, Bossier Country again recommended that the fuel system be flushed and this time recommended that the front engine seal be replaced to stop the oil leak. Bossier Country replaced the seal, then tested the engine for oil leaks and found none. However, Rauschenberg did not retrieve the pickup until more than five months later. Again, Rauschenberg does not contend (and there is no evidence to suggest) that any of these repairs was unnecessary.

The Killeen dealership determined that the pickup was leaking oil because of a cracked timing cover housing. The dealership repaired this problem, but Rauschenberg nevertheless had to return the pickup a few days later because the engine continued to leak oil. The Killeen dealership identified two additional places where the engine was leaking oil and repaired them. Apparently, this finally put an end to the oil leaks.

Rauschenberg essentially contends that, because Bossier Country recommended three separate courses of action to repair the oil leak and because the pickup continued to leak oil after these repairs were made, none of the three recommended repairs was needed. However, we cannot agree that the fact that the recommended repairs did not finally resolve the oil-leak problem inevitably leads to the conclusion that any of the recommended repairs was unnecessary.

Rauschenberg presented no expert (or lay) testimony regarding the necessity of any of the repairs Bossier Country performed. *Cf. Daugherty v. Jacobs,* 187 S.W.3d 607, 614–15 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (plaintiff offered expert testimony to support DTPA claim regarding auto repairs).

Accordingly, we hold that there is no evidence in the record which "would enable reasonable and fair-minded people" to find that Bossier Country made a misrepresentation under section 17.46(b)(13). *Wilson,* 168 S.W.3d at 827.

### (3) representations that services were performed—sec. 17.46(b)(22)

■ Rauschenberg contends that, because he took the pickup to Bossier Country three times to repair the oil leak and because Bossier Country tried but failed to repair the leak on each occasion, Bossier Country necessarily represented that services had been performed when those services had not been performed.

Bossier Country told Rauschenberg on each of the three occasions what repairs it believed were necessary to fix the oil leak. Bossier Country performed the repairs that it told Rauschenberg it would perform. Rauschenberg testified that, on the last occasion at least, someone from Bossier Country told him that the oil leak had been fixed. When he retrieved the pickup however, he found that it was still leaking oil.

From this evidence, we conclude that "reasonable and fair-minded people" could conclude that Bossier Country had represented to Rauschenberg that it had fixed the oil leak when it had in fact not done so. *See Padgett v. Bert Ogden Motors, Inc.,* 869 S.W.2d 532, 536 (Tex.App.-Corpus Christi 1993, writ denied). Thus, the record contains some evidence to support the jury's finding on this issue. *See Wilson,* 168 S.W.3d at 827.

When Rauschenberg retrieved the pickup in early July, a Bossier Country employee told him that the oil leak was fixed.

However, he documented almost immediately that he was having to add several quarts of oil whenever he used the pickup. Bossier Country construes this as evidence that the pickup was *"using* oil after he picked it up, not that it was *leaking* oil." However, Rauschenberg also testified that on one of the trips he took after retrieving the pickup his white trailer turned black because of the oil that was leaking from the engine. Rauschenberg also directly testified that the pickup continued to leak oil after he retrieved it in July.

Finally, Bossier Country notes that Rauschenberg did not include an "oil leak" as one of the bases for his lemon-law complaint.

Although Bossier Country has identified some evidence Bossier Country which is contrary to the jury's finding on this issue, we cannot say that this "finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias." *See C.H.,* 89 S.W.3d at 25. Accordingly, we conclude that the evidence is factually sufficient to support a finding that Bossier Country represented that it had repaired the oil leak when it had in fact not done so.

■ Nevertheless, Bossier Country contends that, because there is no evidence to support two of the three DTPA theories of liability submitted to the jury in a single question, this Court must reverse the finding of liability under the DTPA because it cannot be determined whether the verdict was based on the theory supported by the evidence or on one of the theories without evidentiary support. *See Crown Life Ins.,* 22 S.W.3d at 389.

In *Crown Life Insurance,* the Supreme Court held:

> When a single broad-form liability question erroneously commingles valid and invalid liability theories *and the appellant's objection is timely and specific,* the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding.

*Id.* (emphasis added).

Because Bossier Country did not object to the question in the charge which submitted these three theories of liability to the jury, we must uphold the jury's finding if there is some evidence and factually sufficient evidence to support any of the theories submitted in the question.[11] *See In re A.V.,* 113 S.W.3d 355, 363 (Tex.2003).

We have determined that there is some evidence and factually sufficient evidence to support a finding that Bossier Country represented that it had repaired the oil leak when it had in fact not done so. Accordingly, we overrule Bossier Country's sixth issue.

### Disclaimer Warranties

Bossier Country contends in its seventh issue that a disclaimer in the sales contract for the pickup (and similar disclaimers in each of the repair invoices) precludes Rauschenberg from recovering for breach of any implied or express warranty.

The trial court submitted a single question to the jury on Rauschenberg's warranty claims, inquiring whether Bossier Country breached an express warranty or the implied warranty of good and workmanlike performance.[12] First, we determine the sources of the alleged warranties.

---

**11.** Bossier Country suggested in its motion for new trial that it did object to this question, stating, "The Court erred in submitting Question No. 1 to the jury, over Bossier's objec-

tion...." However, the reporter's record does not bear out this assertion.

**12.** Rauschenberg's petition also alleges breach of the implied warranty of fitness for a

The implied warranty of good and workmanlike performance finds its genesis in caselaw and was first recognized by the Supreme Court in *Melody Home Manufacturing Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex.1987). Conversely, the express warranty at issue in this case arises from the statements of Bossier Country representatives about the promptness of repairs done by Bossier Country's service department and/or from the extended service contract which Rauschenberg purchased when he bought the pickup.[13]

■ The implied warranty of good and workmanlike performance cannot "be waived or disclaimed." *Id.* at 355; *accord Centex Homes v. Buecher*, 95 S.W.3d 266, 270 (Tex.2002).[14] Conversely, an express oral warranty in connection with the sale of goods is not enforceable unless it "becomes part of the basis of the bargain." *See* Tex. Bus. & Com.Code Ann. § 2.313(a)(1) (Vernon 1994); *Balderson–Berger Equip. Co. v. Blount*, 653 S.W.2d 902, 908 (Tex. App.-Amarillo 1983, no writ). If the parties reduce their agreement to writing, a merger clause in that agreement providing that no prior representations are enforceable against the seller unless expressly included within the written contract or other writing and approved by an authorized representative of the seller will render any prior oral representations unenforceable absent proof of fraud, accident, or mistake. *See Balderson–Berger Equip. Co.*, 653 S.W.2d at 908; *accord McCrea v. Cubilla Condominium Corp.*, 685 S.W.2d 755, 757–58 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.) (holding that such a merger clause operated to waive alleged express warranty).

■ Here, an "addendum" to the sales contract between Rauschenberg and Bossier Country provides in pertinent part:

Buyer acknowledges and understands that any oral agreement not reduced to writing will not be binding upon the dealership. If buyer desires such agreement to be reduced to writing, then this must be indicated at the time of the sale. Any written agreement must be approved by an authorized manager of this dealership.

Because of this clause and because Rauschenberg has produced no writing containing the alleged oral warranties and approved by an authorized manager of Bossier Country, the alleged oral warran-

---

particular purpose. However, he did not request the submission of a jury question on this theory of recovery. Thus, he effectively nonsuited this implied warranty claim. *Cf. Alvarez*, 172 S.W.3d at 300–01.

**13.** Rauschenberg's petition alleges breach of "the express warranty issued on said vehicle, under which repairs were to be made."

**14.** In *Centex Homes*, the Court distinguished between the implied warranty of good and workmanlike performance in the repair or modification of tangible goods or property (which cannot be waived or disclaimed) and the implied warranty of good and workmanlike construction in the construction of a new home (which "may be disclaimed by the parties when their agreement provides for the manner, performance or quality of the desired construction."). *See Centex Homes v. Buech-er*, 95 S.W.3d 266, 270–75 (Tex.2002). At least one commentator has suggested that the disclaimer rule announced in *Centex Homes* will eventually become the rule for disclaimer of the implied warranty recognized in *Melody Home*. John Krahmer, *Commercial Transactions*, 56 SMU L.Rev. 1255, 1265 n. 92 (2003). Regardless, even assuming that the disclaimer rule of *Centex Homes* applies here, Rauschenberg's "agreements" with Bossier Country for repair services, though they each contain standard disclaimer language, do not "provide[] for the manner, performance or quality of the desired [repairs]." *See Centex Homes*, 95 S.W.3d at 274–75. Thus, even under *Centex Homes*, Rauschenberg did not disclaim the implied warranty of good and workmanlike performance.

ties are unenforceable. *See Balderson–Berger Equip. Co.*, 653 S.W.2d at 908; *see also McCrea*, 685 S.W.2d at 757–58.

■ To the extent Rauschenberg's breach of warranty claim is based on an alleged breach of the extended service contract (*i.e.*, "extended warranty") he purchased when he bought the pickup, neither the addendum to the sales contract nor the disclaimers contained in each of the repair invoices can be construed as disclaiming the extended warranty coverage.

Section [15] 2.316(a) provides:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (Section 2.202) negation or limitation is inoperative to the extent that such construction is unreasonable.

TEX. BUS. & COM.CODE ANN. § 2.316(a) (Vernon 1994). As comment 1 explains:

> This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude "all warranties, express or implied." It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise.

*Id.* cmt. 1.

Here application of the disclaimers relied on by Bossier Country to preclude enforcement of the extended warranty coverage would be inconsistent with the extended coverage for which Rauschenberg negotiated and paid. Thus, the disclaimers are inoperative to the extent they conflict with the extended warranty. *See Mercedes-Benz of N. Am., Inc. v. Dickenson*, 720 S.W.2d 844, 852 (Tex.App.-Fort Worth 1986, no writ).

Accordingly, we sustain Bossier Country's seventh issue in part and overrule it in part.

## Breach of Warranty

Bossier Country contends in its eighth issue that there is no evidence or factually insufficient evidence that it breached the implied warranty of good and workmanlike performance or the express warranty provided by the extended service contract.

The Supreme Court has defined good and workmanlike performance "as that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Melody Home*, 741 S.W.2d at 354.

■ The implied warranty of good and workmanlike performance in the repair of goods does "not require repairmen to guarantee the *results* of their work." *Id.* at 355. Rather, this implied warranty requires only that those who repair goods "*perform* those services in a good and workmanlike manner." *Id.*

In *Melody Home*, the breach at issue was self-evident.

> In this case, the breach of the implied warranty was plainly within the common knowledge of laymen and did not require expert testimony. The jurors had

---

**15.** The term "section," as used hereinafter, refers to a section of the Business and Commerce Code unless otherwise indicated.

sufficient knowledge to find that the failure to connect a washing machine drain would not be considered good and workmanlike by those capable of judging repair work. *Id.* We cannot say the same for the breach of implied warranty alleged by Rauschenberg.

■ The only testimony in the record by a person arguably qualified to discuss what is "generally considered proficient" in the field of auto mechanics is from Bossier Country's service manager. However, the service manager only authenticated the Bossier Country records offered in evidence and testified about what repairs were performed. The service manager did not characterize the repairs at issue as having been "performed in a manner generally considered proficient" or as having not been performed in such a manner.

The only evidence before the jury on this issue which would arguably support a finding that Bossier Country breached this implied warranty is that the service department at the Killeen dealership was apparently able to diagnose and fully repair the oil leak in two relatively brief attempts.

However, absent expert testimony regarding what is "generally considered proficient" in the field of auto mechanics, it was beyond the purview of the jury to second-guess the Bossier Country service department. *Cf. Daugherty,* 187 S.W.3d at 614–15. The evidence presented was that Bossier Country consulted with the engine manufacturer on each occasion regarding the appropriate repairs and followed the manufacturer's recommendations. On the last repair, after replacing the front engine seal, Bossier Country retested the engine to be sure it was not leaking oil.

Plainly, Rauschenberg is dissatisfied with the results of the repairs performed by the Bossier Country service depart-

ment. However, merely because Bossier Country was not able to fix the oil leak does not mean that it failed to perform the requested repairs in a good and workmanlike manner. Unlike the repairs in *Melody Home,* the repairs at issue here are not "plainly within the common knowledge of laymen." *Cf. Melody Home,* 741 S.W.2d at 355. Accordingly, we cannot say that the record contains evidence which "would enable reasonable and fair-minded people" to conclude that Bossier Country breached an implied warranty of good and workmanlike performance. *See Wilson,* 168 S.W.3d at 827.

■ Rauschenberg also contends that Bossier Country breached the express warranty provided by the extended service contract. To prevail on such a claim, Rauschenberg must establish the existence of the express warranty, that the warranty was breached, and that he suffered injury as a result. *See U.S. Tire–Tech, Inc. v. Boeran, B.V.,* 110 S.W.3d 194, 197 (Tex. App.-Houston [1st Dist.] 2003, pet. denied); *see also Crosbyton Seed Co. v. Mechura Farms,* 875 S.W.2d 353, 361 (Tex.App.-Corpus Christi 1994, no writ) ("to recover for breach of an express warranty, a plaintiff must prove that the affirmation or description was made, that it was part of the basis of the bargain, that the buyer relied on the statements, that the goods failed to comply with the affirmation, that the buyer was financially injured, and that the breached affirmation was a proximate cause of the injury").

■ It has been said that "[a]n express warranty is entirely a matter of contract." *Cravens v. Skinner,* 626 S.W.2d 173, 176 (Tex.App.-Fort Worth 1981, no writ) (quoting *Donelson v. Fairmont Foods Co.,* 252 S.W.2d 796, 799 (Tex.Civ.App.-Waco 1952, writ ref'd n.r.e.)). Thus, to prove the breach of an express warranty, the plain-

tiff must present proof of the terms of the express warranty and proof that one or more of those terms has been breached. *See Songer v. Archer*, 23 S.W.3d 139, 142 (Tex.App.-Texarkana 2000, no pet.); *TCI Cablevision of Tex., Inc. v. S. Tex. Cable Television, Inc.*, 791 S.W.2d 269, 271 (Tex. App.-Corpus Christi 1990, writ denied).

■ Here, the evidence reflects that Rauschenberg purchased an extended service contract which extended the warranty on the pickup. However, the record is silent as to the terms of that warranty. All that can be said with certainty is that the warranty coverage for the pickup's diesel engine lasts for 60 months or 100,-000 miles, whichever occurs first. Presumably, the warranty covers repairs for the specified period. *See* BLACK'S LAW DICTIONARY 1619 (8th ed.2004).[16]

There is no evidence in the record which "would enable reasonable and fair-minded people" to conclude that Bossier Country breached its express warranty to provide repairs on Rauschenberg's pickup. *See Wilson*, 168 S.W.3d at 827.

Accordingly, we sustain Bossier Country's eighth issue.

### Knowing or Intentional Conduct

Bossier Country contends in its ninth and tenth issues respectively that there is no evidence or factually insufficient evidence that it acted knowingly or intentionally when it represented that it had repaired the oil leak even though it had not. In its eleventh issue, Bossier Country contends that because there is no evidence of a knowing or intentional misrepresenta-

tion, the additional damages award cannot stand.

Section 17.45 defines the terms "knowingly" and "intentionally" for purposes of the DTPA.

"Knowingly" means actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

TEX. BUS. & COM.CODE ANN. § 17.45(9) (Vernon 2002).

"Intentionally" means actual awareness of the falsity, deception, or unfairness of the act or practice, or the condition, defect, or failure constituting a breach of warranty giving rise to the consumer's claim, coupled with the specific intent that the consumer act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness. Intention may be inferred from objective manifestations that indicate that the person acted intentionally or from facts showing that a defendant acted with flagrant disregard of prudent and fair business practices to the extent that the defendant should be treated as having acted intentionally.

*Id.* § 17.45(13) (Vernon 2002).

The Supreme Court has clarified the term "actual awareness" as used in these definitions.

---

**16.** Black's Law Dictionary defines an "extended warranty" as:

An additional warranty often sold with the purchase of consumer goods (such as appliances and motor vehicles) to cover re-

pair costs not otherwise covered by a manufacturer's standard warranty, by extending either the standard-warranty coverage period or the range of defects covered.

BLACK'S LAW DICTIONARY 1619 (8th ed.2004).

"Actual awareness" does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway."

*St. Paul Surplus Lines Ins. Co. v. Dal–Worth Tank Co.,* 974 S.W.2d 51, 53–54 (Tex.1998). The Court further explained that "knowingly," "intentionally," and other culpable mental states "lie on a continuum with gross negligence being the lowest mental state and intentional being the highest." *Id.* (quoting *Luna v. N. Star Dodge Sales, Inc.,* 667 S.W.2d 115, 118 (Tex.1984)); *accord Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.,* 130 S.W.3d 181, 197 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

██ Here, Rauschenberg claims that Bossier Country acted knowingly because Bossier Country "did not even attempt to fix the oil leak" on two of the three occasions he sought to have it fixed. However, the record does not support this characterization of Bossier Country's conduct. The record reflects that, on the first occasion, Bossier Country (in consultation with the manufacturer) determined that the turbocharger was the source of the oil leak and replaced it. On the second occasion, it was determined that the breather trap needed to be cleaned to stop the oil leak. Admittedly, there is no evidence in the record that this was done. On the last occasion, it was determined that the front engine seal was the source of the leak, and this seal was replaced. Bossier Country tested the engine after replacing the seal and determined that it was no longer leaking oil.

In addressing Rauschenberg's laundry-list allegations, we have concluded that the evidence supports only a finding that Bossier Country represented that it had repaired the oil leak in January 2001 even though it had not. Therefore, even assuming Bossier Country failed to clean the breather trap as recommended on Rauschenberg's second visit in December 2000, we find no evidence in the record which "would enable reasonable and fair-minded people" to conclude that Bossier Country "knowingly" misrepresented in January 2001 that it had repaired the oil leak. *See St. Paul Surplus Lines Ins. Co.,* 974 S.W.2d at 53–54; *cf. K.C. Roofing Co. v. Abundis,* 940 S.W.2d 375, 377 (Tex.App.-San Antonio 1997, writ denied) (knowing conduct found where contractor admitted work was not done properly but did not fix it even though he continued to bill plaintiff for balance owed); *Star Houston, Inc. v. Kundak,* 843 S.W.2d 294, 300 (Tex.App.-Houston [14th Dist.] 1992, no writ) (knowing conduct found where evidence showed that "resort to readily available reference materials and technical advice from Mercedes would have led to quick resolution of the problems"); *Jeep Eagle Sales Corp. v. Mack Massey Motors, Inc.,* 814 S.W.2d 167, 175 (Tex.App.-El Paso 1991, writ denied) (knowing conduct found where sales manager misrepresented that vehicle was suitable for towing Airstream trailer, dealer refused to honor promise of free oil change, dealer refused to continue servicing vehicle, and manufacturer denied warranty claim).

Because there is no evidence that Bossier Country "knowingly" made an actionable misrepresentation, there is necessarily no evidence that Bossier Country "intentionally" made such a misrepresentation. *See* TEX. BUS. & COM.CODE ANN. § 17.45(13); *St. Paul Surplus Lines Ins. Co.,* 974 S.W.2d at 54; *Comsys Info. Tech. Servs.,* 130 S.W.3d at 197. Because there is no evidence that Bossier Country acted knowingly or intentionally, the

jury's award of additional damages cannot stand. *See* TEX. BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon Supp.2005).

Accordingly, we sustain Bossier Country's ninth, tenth, and eleventh issues.

## Lost Profits

Bossier Country contends in its second issue that there is no evidence or factually insufficient evidence to support the jury's award of $5,000 for lost profits.

■ "Lost profits are damages for the loss of net income to a business measured by reasonable certainty." *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex.2002); *accord Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex.App.-Houston [1st Dist.] 2004, no pet.); *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 209 (Tex.App.-Fort Worth 2004, pet. denied). Net income is "what remains in the conduct of business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Atlas Copco Tools*, 131 S.W.3d at 209 (quoting *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex.App.-Dallas 1988), *writ denied*, 778 S.W.2d 865 (Tex.1989) (per curiam)); *accord Texaco*, 137 S.W.3d at 771.

■ Here, Rauschenberg's son Kelly testified that the hot-shotting business derived its primary income hauling cargo for Jerry's Auto Services. Kelly explained that Jerry's Auto charged each customer a fee based on the mileage traveled for the delivery and also a fuel surcharge of 10 cents per mile for each delivery.[17] Kelly testified that Jerry's Auto then paid him about 77% of the invoice total for each customer. The fuel surcharge roughly equated the cost of fuel for the delivery.

Not including the fuel surcharge, Kelly calculated that he had income of about $3,332 per month for June, July, and August 2000.

Based on this evidence, Rauschenberg asked the jury to award him $13,000 in lost profits, which represents $1,666 per month (because Kelly and he had agreed to split the receipts from the hot-shotting business) for eight months (December 2000 through July 2001).[18] However, the jury awarded only $5,000 in lost profits.

Bossier Country contends that there is no evidence to support this award because Rauschenberg failed to account for "all of the expenses" incurred in the hot-shotting business. *See Texaco*, 137 S.W.3d at 771; *Atlas Copco Tools*, 131 S.W.3d at 209; *Turner*, 765 S.W.2d at 465. We agree.

■ A plaintiff need not provide "exact calculations" to recover for lost profits. *Helena Chem. Co.*, 47 S.W.3d at 504. "At a minimum [however], opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained." *Id.*

Here, Rauschenberg did not account for all the expenses incurred in the hot-shotting business. Thus, he failed to provide sufficient "facts, figures, or data" from which the jury could ascertain lost net profits. *See Texaco*, 137 S.W.3d at 771–73; *Atlas Copco Tools*, 131 S.W.3d at 209. Accordingly, we sustain Bossier Country's second issue.

## Loss of Use

Bossier Country contends in its third issue that there is no evidence or factually insufficient evidence to support the jury's

---

**17.** A brief analysis of the invoices for out-of state deliveries reveals that Jerry's Auto charged $1.40 per mile for deliveries in addition to the fuel surcharge.

**18.** 8 months $\times$ $1,666=$13,328.

award of $2,100 as the reasonable value for the loss of use of the pickup because Rauschenberg provided no evidence about the reasonable rental value of a substitute pickup.

■ Proof of the reasonable rental value of a substitute vehicle is the usual measure for proving up loss of use. *See Luna*, 667 S.W.2d at 119; *Goose Creek Consol. Indep. Sch. Dist. v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 497 (Tex. App.-Texarkana 2002, pet. denied). However, this is not the sole measure for proving up loss of use. *See, e.g., Goose Creek*, 74 S.W.3d at 498; *Amelia's Automotive, Inc. v. Rodriguez*, 921 S.W.2d 767, 771 (Tex.App.-San Antonio 1996, no writ); *Chem. Express Carriers, Inc. v. French*, 759 S.W.2d 683, 687–88 (Tex.App.-Corpus Christi 1988, writ denied); *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 804–05 (Tex.App.-Dallas 1987, no writ).

In *Goose Creek*, the court approved a school district's use of a modified diminution of value calculation as an appropriate basis to measure loss of use for school buildings. 74 S.W.3d at 498–99. In *Amelia's Automotive* and *Chemical Express Carriers*, the courts approved lost profits as an appropriate measure for loss of use because the plaintiffs in those cases lost the opportunity to accrue earnings because of the loss of use of a truck in one case and an airplane in the other. *See Amelia's Automotive*, 921 S.W.2d at 771–72; *Chem. Express Carriers*, 759 S.W.2d at 687–88. In *Town East Ford*, the plaintiff was permitted to use replacement cost (down payment, taxes and fees, and monthly payment) as a measure for loss of use because the cost for a replacement car was significantly less than the monthly rental would be. 730 S.W.2d at 804–05.

Here, Rauschenberg testified that he did not know where he could rent a pickup comparable to the one he had purchased

from Bossier Country. Proof of the reasonable rental value of a substitute vehicle is not the exclusive measure for proving up loss of use. *See Goose Creek*, 74 S.W.3d at 498; *Amelia's Automotive*, 921 S.W.2d at 771; *Chem. Express Carriers*, 759 S.W.2d at 687–88; *Town East Ford*, 730 S.W.2d at 804–05.

■ We have already concluded that Rauschenberg did not prove up his lost profits. However, Rauschenberg did prove the monthly payment for the pickup, $698.65. This is plainly evidence of what it cost Rauschenberg to use the pickup on a monthly basis. *Cf. Town East Ford*, 730 S.W.2d at 804–05. Thus, we hold that this is an appropriate measure for determining the value for the loss of use of the pickup.

■ Nevertheless, Rauschenberg is only entitled to be compensated for the period of time he was denied use of the pickup because of Bossier Country's misconduct. *See* TEX. BUS. & COM.CODE ANN. § 17.50(a) (Vernon Supp.2005) (plaintiff entitled to recover damages for which DTPA violation was producing cause). In addition, a DTPA plaintiff has a duty to mitigate damages. *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 858 (Tex.1999).

Therefore, Rauschenberg's potential period of compensation for Bossier Country's misrepresentation began at the earliest when Bossier Country made the misrepresentation in January about having repaired the pickup. However, Rauschenberg did not retrieve the pickup from Bossier Country until July 2. He cannot recover damages for loss of use of the pickup during this period because he voluntarily chose to not retrieve it. *See id.*

Rauschenberg testified that, after he retrieved the pickup on July 2, the pickup continued to leak oil and not run well. He took the pickup to the Killeen dealership

for repair on July 24. It was not ultimately repaired until August 3.

Therefore, Rauschenberg provided evidence of loss of use from July 2 through August 3, a total of thirty-three days inclusive of the beginning and ending dates. Bossier Country suggests that a per diem rate of $23.28 may be applied if it is determined that the monthly payment is an appropriate measure for loss of use damages.[19] We accept Bossier Country's suggestion and apply this per diem rate to the thirty-three days for which Rauschenberg has shown himself entitled to loss of use damages. The resulting amount is $768.24.

Accordingly, we sustain Bossier Country's third issue in part. Because we have determined that the evidence is factually insufficient to support the jury's award of loss of use damages, we will suggest a remittitur of $1,331.76. *See* TEX.R.APP. P. 46.3; *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 851 (Tex.2000); *Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 72 (Tex. App.-Texarkana 2004, pet. denied).

### Reasonable Value of Time

Bossier Country contends in its fourth issue that there is no evidence or factually insufficient evidence to support the jury's award of $1,000 as compensation for the reasonable value of Rauschenberg's time spent attempting to correct problems with the repair of the pickup.

■ Under section 17.50(a), a DTPA plaintiff may recover "economic damages" for which the defendant's misconduct was a producing cause. TEX. BUS. & COM.CODE

ANN. § 17.50(a). The term "economic damages" has been construed to include "the total loss sustained [by the consumer] as a result of the deceptive trade practice" which "includ[es] related and reasonably necessary expenses." *Manon v. Tejas Toyota, Inc.*, 162 S.W.3d 743, 754 (Tex. App.-Houston [14th Dist.] 2005, no pet.) (quoting *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 162 (Tex.1992)); *accord Matheus v. Sasser*, 164 S.W.3d 453, 459–60 (Tex.App.-Fort Worth 2005, no pet.).

Bossier Country does not contend that Rauschenberg is not entitled to be compensated for the reasonable value of his time spent attempting to correct problems with the repair of the pickup. Rather, it contends that, because he used his daily pay ($250) to calculate this element of his damages, he should receive this compensation only for days he had to miss work. We agree.

On cross-examination, Rauschenberg testified that he had to drive to Bossier Country four times in his attempts to resolve the problems with the repair of the pickup.[20] However, he conceded that one of these visits occurred on Saturday, when he did not work. Accordingly, the evidence supports only $750 in damages for the reasonable value of his time.

Therefore, we sustain Bossier Country's fourth issue in part. Because we have determined that the evidence is factually insufficient to support the jury's award of damages for the reasonable value of Rauschenberg's time, we will suggest a remittitur of $250. *See* TEX.R.APP. P. 46.3; *Tor-*

---

**19.** Bossier Country reaches this per diem rate by dividing the monthly payment of $698.65 by 30 days.

**20.** Bossier Country characterizes Rauschenberg's testimony as establishing only 3 trips to Bossier Country. However, we read his testimony as establishing 4 trips: (1) 1 trip on a Saturday, (2) 2 trips in efforts to meet with Bossier Country management and a Daimler-Chrysler representative, and (3) 1 trip on a Friday ("One Friday, I came over, and I don't know which Friday it was.").

*rington Co.*, 46 S.W.3d at 851; *Burke*, 138 S.W.3d at 72.

## Travel Expenses

■ Bossier Country contends in its fifth issue that there is no evidence or factually insufficient evidence to support the jury's award of $312 for what was designated in the charge as "out-of-pocket expenses." Based on Rauschenberg's testimony and argument of counsel, this award appears to be based on mileage compensation Rauschenberg testified he should receive.

■ Travel expenses may be awarded as economic damages in a DTPA suit. *See Dillon v. Troublefield*, 601 S.W.2d 141, 143 (Tex.Civ.App.-Austin 1980, no writ); *see also Henry S. Miller Co.*, 836 S.W.2d at 162; *Matheus*, 164 S.W.3d at 459–60; *Manon*, 162 S.W.3d at 754.

Rauschenberg testified that employees at his place of business are paid 30 cents per mile when traveling on company business. He asked the jury to award him 30 cents per mile for the trips he made to Bossier Country relating to the repair of the pickup. He testified that it is 208 miles from his home to Bossier Country. Apparently, the jury decided to compensate him for five trips to Bossier Country.[21]

As with compensation for loss of time, Bossier Country does not contend that 30 cents is an inappropriate measure. Rather, it challenges the number of trips for which Rauschenberg is entitled to compensation. We agree.

As stated in the discussion of Rauschenberg's fourth issue, Rauschenberg testified on cross-examination that he made four trips to Bossier Country. Accordingly, we sustain Bossier Country's fifth issue in

part. Because we have determined that the evidence is factually insufficient to support the jury's award of damages for travel expenses, we will suggest a remittitur of $62. *See* TEX.R.APP. P. 46.3; *Torrington Co.*, 46 S.W.3d at 851; *Burke*, 138 S.W.3d at 72.

## Attorney's Fees

Bossier Country contends in its twelfth issue that Rauschenberg is not entitled to attorney's fees because he failed to prove the alleged DTPA violations. Bossier Country contends in its thirteenth issue that the attorney's fee award must be modified because there is no evidence or factually insufficient evidence to prove all or part of the damages awarded.

■ Under the DTPA, "[e]ach consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." TEX. BUS. & COM.CODE ANN. § 17.50(d) (Vernon Supp.2005). Thus, the award of reasonable and necessary attorney's fees is mandatory for a prevailing DTPA plaintiff. *Continental Dredging, Inc. v. De–Kaizered, Inc.*, 120 S.W.3d 380, 396 (Tex.App.-Texarkana 2003, pet. denied). We have determined that Rauschenberg is entitled to prevail on one of his allegations that Bossier Country violated the DTPA.

Nevertheless, Bossier Country contends that the attorney's fee award must be recalculated because it is no longer reasonable in light of the modifications we have made to the damages award. Bossier Country cites *Arthur Andersen & Co. v. Perry Equipment Corp.* to support its assertion that the result obtained in a lawsuit is a factor to be considered in determining the reasonableness of an attorney's fee award. 945 S.W.2d 812, 818 (Tex.1997).

---

21.  208 miles × 5 trips × 30 cents per mile =   $312.

We agree that the result of the litigation is a factor. However, it is only part of one of the eight factors listed for consideration in *Arthur Andersen.*[22] *See id.* Thus, we decline to reverse the attorney's fee award solely because a remittitur has been suggested.

Rauschenberg proved that Bossier Country committed a violation of the DTPA. His attorney testified to the amount of reasonable and necessary attorney's fees incurred. Accordingly, we overrule Bossier Country's twelfth and thirteenth issues.

### Conclusion

We affirm the judgment insofar as it recites a finding that Bossier Country committed a "False, Misleading, or Deceptive Act or Practice" and insofar as it awards Rauschenberg reasonable and necessary attorney's fees for trial and in the event of an appeal.

We reverse the judgment insofar as it recites findings that Bossier Country "Fail[ed] to Comply With a Warranty" and acted "Knowingly and Intentionally" and render judgment that Rauschenberg take nothing on these claims and on his related claim for additional damages under the DTPA. We likewise reverse the judgment on Rauschenberg's claim for lost profits and render judgment that Rauschenberg take nothing on this element of his damages claim.[23]

Because the evidence is factually insufficient to support the remainder of the jury's award for "actual and/or economic damages," we suggest a remittitur of $1,643.76. Therefore, if Rauschenberg files a remittitur of $1,643.76 with the Clerk of this Court within twenty-one (21) days after the date of this opinion, we will modify the trial court's judgment to award "actual and/or economic damages" of $1,768.24, plus attorneys fee's and costs and post-judgment interest as ordered by the trial court.

However, if Rauschenberg fails to make the suggested remittitur, we will reverse the judgment and remand this cause for a new trial on liability and damages. *See* TEX.R.APP. P. 44.1(b); *Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex.2001) (per curiam).

Chief Justice GRAY dissents, noting there are many statements in the opinion with which I cannot agree but I dissent from the judgment based upon the Court's

---

**22.** The 8 factors listed in *Arthur Andersen* are:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.
*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997) (citing TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 2005) (TEX. STATE BAR R. art. X, § 9)).

**23.** Remittitur is inappropriate on a no-evidence finding. *Cf. Torrington Co. v. Stutzman*, 46 S.W.3d 829, 851 (Tex.2000) ("an appellate court may not order a remittitur unless the evidence supporting damages is factually insufficient").

award of attorney fees for the appeal to the party losing the appeal. While Mr. Rauschenberg held onto a meager recovery, there is no way to view the result as anything other than a loss for Mr. Rauschenberg. Accordingly, I would not affirm the trial court's award of attorney fees on appeal. Given the substantial reduction in Rauschenberg's recovery, I would also suggest a remittitur in the attorney fee for trial award.