

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00316-CV

_____

CHARISSE SNEDDEKER, SHERRY PIPES, AND CSF NUTRITION, LLC,
Appellants

V.

VITA 10 IV THERAPY, LLC, Appellee

On Appeal from the 467th District Court
Denton County, Texas
Trial Court No. 22-7782-467

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

**MEMORANDUM OPINION**

This is an appeal from a judgment after a bench trial. The judgment awarded damages and attorney's fees to Appellee Vita 10 IV Therapy, LLC, against Appellant Charisse Sneddeker for breach of contract and denied recovery to all Appellants—Sneddeker, Sherry Pipes, and CSF Nutrition, LLC—on their counterclaims and third-party claims. We will affirm.

## I.       Background

Appellants do not challenge the sufficiency of the evidence to support the trial court's findings of fact or implied findings. Therefore, we need not detail the evidence except as necessary to address the specific matters challenged on appeal. *See Tite Water Energy, LLC v. Wild Willy's Welding LLC*, No. 01-22-00158-CV, 2023 WL 5615816, at *2 n.3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, pet. denied) (mem. op.).

Appellee's principals, Lindsey and Crystal Walterscheid, purchased Appellee from Dr. Jeffrey Shadle. Included in the purchase was the name of the business (Vita 10 IV Therapy, LLC), the social media, the website, and the drip recipes for intravenous injections. Appellee provides "wellness injections" through intravenous (IV) therapy for the purpose of combatting dehydration. More specifically, Appellee sells and administers intravenous injections containing fluids and vitamins to customers at physical locations.

Appellee purchases the injection products from a pharmacy. Before receiving an injection, Appellee's customers complete a "health questionnaire." Appellee maintains

charts for each customer, and customers update their medical information each time they visit Appellee. Appellee applies HIPAA (Health Insurance Portability and Accountability Act) protections to conversations between its staff and customers. Dr. Leah Dill is a physician who was the medical director for Appellee when the parties signed the franchise agreement in this case. Dr. Dill set guidelines to determine whether a customer medically qualified to receive an intravenous drip.

Sneddeker approached Appellee about potential "business options" in March 2021. Sneddeker and the Walterscheids knew each other personally. Between the parties' initial meeting in March 2021 and July 21, 2021 (the date of the franchise agreement), they frequently communicated about how Sneddeker and CSF Nutrition, LLC (CSF) (a company formed by Sneddeker; Pipes, Sneddeker's mother; and Sneddeker's father) should budget their business, seek and hire staff, train staff (including Sneddeker), and prepare to launch a new business. Much of that communication was not discussed at trial but is included within the record that accompanied Appellants' motion for partial summary judgment on their claims under the Deceptive Trade Practices Act (DTPA) and Texas Business Opportunity Act (TBOA).

Pipes formed CSF under Wyoming law for purported tax benefits. CSF's purpose was to conduct Sneddeker's franchised IV therapy business. Pipes claimed that she formed CSF "[b]ecause [she was] told by [Appellee's principals that] 'in order to be

3

able to do this business, we had to have an LLC, and that's why we couldn't open in May, because it wasn't ready yet.'"

On July 21, 2021, Appellee and Sneddeker signed the franchise agreement. At the time of contracting, no physician owned any interest in Appellee—an LLC—or in Sneddeker's franchise. Nonetheless, the franchise agreement called for Sneddeker to pay franchise fees to Appellee based on the number of intravenous drips sold and administered at Sneddeker's franchise location. Sneddeker's franchise location opened on the last day of August 2021.

Ultimately, Sneddeker told the Walterscheids that her franchise was not generating as much income as she expected and that the costs were higher than expected. Regardless, Sneddeker purportedly hoped to adjust the franchise fees and continue operating.

In January 2022, Appellants hired an attorney to negotiate with Appellee. The purported impetus of those negotiations was that the Waltersheids wanted to open another franchised location, which Sneddeker suspected breached the franchise agreement because it was too close to Sneddeker's location. Sneddeker's attorneys hired in connection with that dispute advised her that her franchise was operating illegally because it was not owned by a physician. Appellants purportedly closed their location and ended their relationship with Appellee when they became convinced that they were not operating legally.

Appellee sued Sneddeker and Pipes (who witnessed the franchise agreement) for unpaid franchise fees (breach of contract). Sneddeker and Pipes countersued Appellee (joined by CSF as intervenor and third-party plaintiff) asserting various causes of action, including the TBOA, Tex. Bus. & Com. Code Ann. §§ 51.151–.161, and the DTPA, Tex. Bus. & Com. Code Ann. § 17.46(b), claiming that

- Appellee falsely represented to Sneddeker that Appellants would profit by opening a Vita 10 franchise;

- Appellee refused to provide a franchise disclosure document pursuant to relevant state and federal law governing franchisors;

- By refusing to provide a franchise disclosure document, Appellee withheld information it was required by law to disclose, including (1) a copy of the seller's financial statements; (2) a complete description of training to be provided; and (3) the total number of purchases or business opportunities involving the product or services being offered that have actually achieved sales or earnings in the amount or range specified;

- Appellee falsely represented that the cost for three months of its employee salaries was $2,000 a month, when it was actually $16,500.00 a month; and

- Appellee represented its business model was legal, when, in fact, it was not.

CSF intervened with its "third party petition," asserting the same claims as Sneddeker and Pipes.

Appellee moved for summary judgment with respect to Pipes's and CSF's claims. The trial court granted that summary judgment motion as to Pipes and dismissed her third-party claim. Although Pipes is listed as an appellant in the style, she is not seeking any relief in this appeal. The trial court denied Appellee's motion on CSF's claims.

5

Sneddeker and CSF moved for partial traditional summary judgment on their DTPA and TBOA claims against Appellee. At the pretrial conference, the trial court advised the parties that it had signed an order granting that motion, but the order actually recited that the "motion should be granted as to liability" on the TBOA and DTPA violations and that the "Court will set a date for a trial on damages."

On the second and final day of the bench trial, the trial court stated, after hearing testimony from all four trial witnesses, that "[t]he Court has received the amended order granting traditional motion for partial summary judgment initialed by counsel for Plaintiff and counsel for Defendants . . . . The Court will sign the order as presented to the Court and have [it] filed with the clerk's office." The court signed the amended order, which also recited that the "Motion should be GRANTED as to liability" for Sneddeker's and CSF's "claims against [Appellee] for violations of the Texas Business Opportunity Act and the Deceptive Trade Practices Act."

The trial court then issued a Final Judgment and supporting "Memorandum, Court's Final Trial Ruling" that was incorporated into the Judgment. Under a heading that reads "Ruling on Defendant Charisse Sneddeker and CSF Nutrition, LLC's claims," the Memorandum states,

- "Plaintiff [Appellee] breached the Texas Business Opportunity Act by failure to provide a disclosure statement with information in the form required by the Act; however, the Court finds that Defendants were provided information although not in the form of a disclosure statement."

- "In addition, the Court further finds that Plaintiff [Appellee] did not use a false, misleading, or deceptive act or practice."

6

- "The Court finds that the alleged actions of the Plaintiff [Appellee] were not the producing cause of damages claimed by the Defendant [Sneddeker]."

Appellants contend that those findings conflict with the amended summary judgment order that Appellee was liable for violations of the TBOA and DTPA. The Final Judgment awarded zero dollars to Sneddeker, including the claims for violation of the TBOA and DTPA. The Final Judgment denied CSF's claims in their entirety because CSF did not have standing or capacity to sue in Texas. The Final Judgment awarded Appellee $33,037.57 against Sneddeker for breach of the franchise agreement, excluding attorneys' fees, which were also awarded ($129,393.15). Appellants filed no post-judgment motions but proceeded to file this appeal.

## II. Standards of Review and Legal Principles

### a. Error Preservation

Generally, in order to preserve a complaint for appellate review, the record must show (1) the complaint was made to the trial court by a sufficient and timely request, objection, or motion; (2) the grounds for the ruling that the complaining party sought from the trial court; (3) compliance with the applicable rules of evidence and procedure; and (4) the trial court ruled on the complaint (explicitly or implicitly) or refused to rule on the complaint and the objecting party objected to the court's refusal to rule. Tex. R. App. P. 33.1(a); *Lake v. Premier Transp.*, 246 S.W.3d 167, 173–74 (Tex. App.—Tyler 2007, no pet.) (holding that a conflict in jury findings that became apparent after the trial court disregarded certain findings was waived when not presented to the trial court

before appeal); *GXG, Inc. and Knox v. Equitable Bank-Dall.*, No. 05-95-00478-CV, 1997 WL 51210, at *5 (Tex. App.—Dallas Feb. 10, 1997, writ denied) (op. on reh'g) (not designated for publication) (holding that when an error first becomes apparent when the judgment is signed, the complaining party must bring the error to the trial court's attention post-judgment or it is waived); *cf. Allen v. Enbridge G&P (E. Tex.) L.P.*, No. 12-14-00034-CV, 2016 WL 364003, at *6 (Tex. App.—Tyler Jan. 29, 2016, no pet.) (mem. op.) (holding that a trial court's failure to include a partial summary judgment order in the final amended judgment was preserved for appeal by raising the complaint in the motion for new trial).

### b. Standards of Review

We review a trial court's conclusions of law de novo. *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020). We may review conclusions of law to determine their correctness based upon the facts, but we will not reverse because of an erroneous conclusion if the trial court rendered the proper judgment. *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)); *City of Forest Hill v. Benson*, 555 S.W.3d 284, 289 (Tex. App.—Fort Worth 2018, no pet.). That is, because a trial court's conclusions of law are not binding on us, we will not reverse a trial court's judgment based on an incorrect conclusion of law when the controlling findings of fact support the judgment on a correct legal theory. *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 127 (Tex. App.—

8

Fort Worth 2016, no pet.); *Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 679 (Tex. App.—Fort Worth 2015, no pet.).

Although findings of fact and conclusions of law should be made in documents separate from the judgment, findings that are made in the judgment still have "probative value and are valid as findings." *In re C.A.B.*, 289 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see Bradley v. Chapman*, No. 04-20-00539-CV, 2022 WL 379358, at *3 n.7 (Tex. App.—San Antonio Feb. 9, 2022, no pet.) (mem. op.). If findings in the judgment conflict with separately filed findings made in accordance with the Rules of Procedure, the latter findings control for appellate purposes. Tex. R. Civ. P. 299a.

Whether a contract violates public policy is a question of law, which we review de novo. *BRCC Enters. LLC v. Skie*, 697 S.W.3d 417, 429 (Tex. App.—Houston [14th Dist.] 2024, no pet.); *Goldman v. Olmstead*, 414 S.W.3d 346, 356 (Tex. App.—Dallas 2013, pet. denied). Contracts that are illegal violate public policy and are void. *Woundkair Concepts, Inc. v. Walsh*, No. 02-10-00349-CV, 2012 WL 955388, at *2 (Tex. App.—Fort Worth Mar. 22, 2012, no pet.) (mem. op.); *Villanueva v. Gonzalez*, 123 S.W.3d 461, 464 (Tex. App.—San Antonio 2003, no pet.). Therefore, our review of a contract's legality is de novo. *See Phila. Indem. Ins. v. White*, 490 S.W.3d 468, 476 n.6 (Tex. 2016) (noting that a question of whether a contract is illegal because it violates a statute or violates public policy is the same, the real question is whether a statute prohibits the conduct required in the agreement.)

9

### c. Legal Principles

#### i. Illegality of Contract Defense

We summarized the contract illegality defense in *Woundkair*, where we said,

> A contract that cannot be performed without violating the law is void. But a contract that could have been performed in a legal manner will not be declared void merely because it may have been performed in an illegal manner or because illegal acts were committed in carrying it out. When two constructions of a contract are possible, a court should give preference to the construction that does not result in violation of the law. And when the illegality does not appear on the face of the contract, it will not be held void unless the facts showing its illegality are before the court.

*Woundkair Concepts, Inc.*, 2012 WL 955388, at *2 (citations omitted).

#### ii. Lack of Capacity to Sue

A challenge to a party's capacity must be raised by filing a verified pleading in the trial court. *Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005). A verified answer is sufficient. *JPMorgan Chase Bank, N.A. v. Prof. Pharmacy II*, 508 S.W.3d 391, 409 (Tex. App.—Fort Worth Dec. 31, 2014, no pet.); *Bossier Chrysler Dodge II, Inc. v. Rauschenberg*, 201 S.W.3d 787, 797–98 (Tex. App.—Waco 2006), *rev'd in part on other grounds*, 238 S.W.3d 376 (Tex. 2007). It can also be raised by a verified motion. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 56 (Tex. 2003); *Century 21/Elmer White Co. v. Shea*, No. 3-90-267-CV, 1992 WL 146869, at *3 (Tex. App.—Austin Jan. 15, 1992, no writ) (mem. op. on reh'g, not designated for publication); *cf. Graywest, LLC v. Neely*, No. 2-06-197-CV, 2007 WL 614036, at *3 (Tex. App.—Fort Worth Mar. 1, 2007, no pet.) (mem. op.) (affirming trial court's dismissal of case after appellee filed motion to

abate challenging appellant's capacity). Once a verified denial has been filed, the capacity of the challenged party has been controverted, and the challenged party then bears the burden of proving at trial that it is entitled to recover in the capacity in which it filed suit. *JPMorgan Chase Bank, N.A.*, 508 S.W.3d at 409; *see also Grapevine Diamond, L.P. v. City Bank*, No. 05-14-00260-CV, 2015 WL 8013401, at *3 (Tex. App.—Dallas Dec. 7, 2015, pet. denied) (mem. op.); *Bossier Chrysler Dodge II, Inc.*, 201 S.W.3d at 798. We review a trial court's ruling granting a dismissal for lack of capacity under an abuse of discretion standard. *Graywest, LLC*, 2007 WL 614036, at *3–4.[1]

### iii.    Lack of Standing

We review questions of standing de novo. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004). Standing is a threshold requirement to maintaining a lawsuit. *Farmers Tex. Cnty. Mut. Ins. v. Beasley*, 598 S.W.3d 237, 240 (Tex. 2020). To establish standing, a plaintiff must allege "a concrete injury . . . and a real

---

[1]Appellants contend that this court has never directly addressed whether a lack of capacity may be raised by a procedural device other than a verified plea in abatement. Appellants direct the court's attention to decisions by some of our sister courts, which hold that a verified plea in abatement is the proper means of raising a capacity defense and that failure to raise it by such a plea constitutes a waiver. While we do not disagree that a verified plea in abatement may be a proper method of raising a lack of capacity, we do not agree that a party waives a lack of capacity defense because it did not assert it through a verified plea in abatement. Since the Texas Supreme Court has not held that a lack of capacity may only be raised by a verified plea in abatement or be waived, we decline to do so. *See Coastal Liquids Transp. L.P. v. Harris Cnty. Appraisal Dist.*, 46 S.W.3d 880, 885 (Tex. 2001). To the extent that our sister courts have so held, we respectfully disagree. *See JPMorgan Chase Bank, N.A.*, 508 S.W.3d at 409.

controversy between the parties that will be resolved by the court." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012).

## III. Analysis

### a. Issues and Holdings Summary

Appellants bring four issues, the first two with subparts. The first issue argues that the trial court erred by enforcing the franchise agreement because it is void under the Medical Practice Act (MPA). *See* Tex. Occ. Code Ann. §§ 151.001–171.024. Under this issue, Appellants argue that the agreement violated the MPA because it required Appellants to pay Appellee fees earned by practicing medicine when neither Vita 10 nor Appellants' franchise were owned by a physician. Second, Appellants argue that because the agreement was illegal, it was void at the outset. Finally, Appellants argue that the trial court erred by awarding damages and attorney's fees to Appellee for breach of a void contract that is a "nullity" under Texas law. Because we hold that Appellants failed to prove that the contract was illegal, we overrule the first issue.

Appellants argue in their second and third issues that the trial court erred in determining that CSF lacked capacity to sue and standing to bring its third-party claims against Appellee. Under these issues, which Appellants argue together, they first assert that Appellee never challenged CSF's capacity by a verified plea in abatement, thereby waiving its capacity defense. Second, Appellants argue that the trial court erred in determining CSF lacked standing to bring its third-party claims by conflating standing and capacity. Although we hold that the trial court conflated standing and capacity, we

12

overrule Appellants' second and third issues because we hold that Appellee did not waive its lack of capacity defense, and the trial court did not abuse its discretion in rendering judgment for Appellee because CSF lacked capacity to assert its third-party claim.

In the fourth issue, Appellants argue the trial court erred by "withdrawing" its summary judgment order for Appellants on their DTPA and TBOA claims after the end of trial with no prior notice to Appellants, thereby depriving Appellants of their ability to try those claims. Because we hold that Appellants failed to preserve this complaint for review, we overrule it.

### b. First Issue—Illegality of the Franchise Agreement

Appellants' first issue contends that the trial court erred in enforcing the franchise agreement because it was illegal under the MPA and therefore void. It is allegedly illegal because it requires the franchisee, Sneddeker, to pay fees earned by "practicing medicine" to the franchisor, Appellee, when neither the franchisor nor franchisee were licensed to practice medicine. Because we hold that Appellants failed to prove that the contract was illegal, we overrule this issue.

As a general rule, parties in Texas may contract as they wish so long as the agreement reached does not violate the law. *See Phila. Indem. Ins.*, 490 S.W.3d at 471. The presumption being in favor of legality of contracts, the burden of proof fell upon Appellants to prove the illegality. *See id.* at 485.

13

Appellants' illegality argument is prefaced on the conclusion that the services being rendered by Appellants and Appellee under the franchise agreement are within the MPA's broad definition of "practicing of medicine." Specifically, Appellants contend, Appellee

> sold and administered intravenous injections of vitamins and fluids. The supply of fluids via intravenous injection is within the definition of "practicing medicine." *See* Tex. Occ. Code Ann. § 151.002 (a)(13). Specifically, injection of intravenous fluid is a "treatment" or "method" of treating a "disorder." *Willis v. Noble Envtl. Power, LLC*, 143 F. Supp. 3d 475, 479 (N.D. Tex. 2015) ("Dehydration constitutes a physiological disorder that affects one or more body systems."). [Appellee] purchased the product it injected into its customers from a pharmacy. Before receiving the injection, [Appellee's] customers completed a "health questionnaire." [Appellee] maintained medical "charts" for each customer, and customers updated their medical information each time they visited [Appellee]. HIPPA [sic] protections applied to conversations between [Appellee's] staff and customers. Dr. Dill (an employee of [Appellee] at the time of contracting) set guidelines to determine whether a customer medically qualified to receive an intravenous drip. And [Appellee] "charg[ed] money" for the "service" of administering intravenous injections. *See* Tex. Occ. Code Ann. § 151.002 (a)(13)(B). Based on these facts, [Appellee's] business model included and involved the practice of medicine.

> [Appellee] contracted to franchise that business model, including its practice of medicine, to Sneddeker. At the time of contracting, no physician owned any interest in [Appellee], an LLC. And Sneddeker, the franchisee, is not and never has been a physician. Nonetheless, the franchise agreement called for Sneddeker to pay franchise fees to [Appellee] based on the number of intravenous drips sold and administered at Sneddeker's location of [the franchise] from July 21, 2021, until Sneddeker voluntarily shut down her location because it was operating in violation of the Medical Practice Act.

According to the evidence at trial, Dr. Leah Dill was a physician who served as Appellee's Medical Director under a contract. Dr. Dill was not an owner of Appellee at

14

the time the franchise agreement was executed. Dr. Dill's role was to establish standing orders and guidelines for Appellee's employees regarding the kinds of patients who would be qualified for infusions and the contents of the infusions. Appellee's staff consisted of registered and vocational nurses, paramedics, and infusion therapists. Nonetheless, the franchise agreement called for Sneddeker to pay franchise fees to Appellee based on a calculation of the gross sales of her franchise multiplied by the franchise fee percentage in the franchise agreement for each seven-day period during the agreement.

Under the franchise agreement, Dr. Dill was to perform "medical overview" for Sneddeker at her franchise location. The franchise agreement did not establish the nature of Dr. Dill's relationship to Sneddeker's franchise location or her specific duties, and the evidence at trial did not shed any further light on those topics. The franchise agreement provided that Dr. Dill would be compensated by Sneddeker for her "medical overview" services based on a formula involving a percentage of gross proceeds from product sales on a weekly basis.

Appellants' argument rises, and ultimately falls, on whether the services of selling and administering intravenous infusion products under the franchise agreement constituted the practice of medicine. The MPA defines "practicing medicine" as

> the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who:
>
>> (A) publicly professes to be a physician or surgeon; or

15

(B) directly or indirectly charges money or other compensation for those services.

Tex. Occ. Code Ann. § 151.002(a)(13).

The MPA defines a "physician" as "a person licensed to practice medicine in this state." *Id.* § 151.002(a)(12). A "person" is defined as "an individual, unless the term is expressly made applicable to a partnership, association, or corporation." *Id.* § 151.002(a)(11). "A person may not practice medicine in this state unless the person holds a license issued under this subtitle." *Id.* § 155.001. If a physician personally administered intravenous fluids to a patient to treat dehydration, that physician would be practicing medicine under these definitions. If a non-physician who is not licensed to administer intravenous fluids to another person performed such action, he or she might be practicing medicine without a license in violation of the MPA.

But, what if a professionally licensed person, like a nurse, administers intravenous fluids to treat dehydration pursuant to a physician's orders? The Nursing Practice Act (NPA) defines "professional nursing" to mean

> the performance of an act that requires substantial specialized judgment and skill, the proper performance of which is based on knowledge and application of the principles of biological, physical, and social science as acquired by a completed course in an approved school of professional nursing. The term does not include acts of medical diagnosis or the prescription of therapeutic or corrective measures. Professional nursing involves: . . . (C) the administration of a medication or treatment as ordered by a physician, podiatrist, or dentist.

*Id.* § 301.002(2)(c). The NPA defines "vocational nursing" to mean

16

a directed scope of nursing practice, including the performance of an act that requires specialized judgment and skill, the proper performance of which is based on knowledge and application of the principles of biological, physical, and social science as acquired by a completed course in an approved school of vocational nursing. The term does not include acts of medical diagnosis or the prescription of therapeutic or corrective measures. Vocational nursing involves: . . . (F) engaging in other acts that require education and training, as prescribed by board rules and policies, commensurate with the nurse's experience, continuing education, and demonstrated competency.

*Id.* § 301.002(5)(f).

What if a person, like a licensed perfusionist, administers intravenous fluids to treat dehydration pursuant to a physician's orders? The Licensed Perfusionist Act (LPA) provides that a person practices perfusion when the person performs activities necessary to "support, treat, measure, or supplement the cardiovascular, circulatory, or respiratory system, or a combination of those activities." *Id.* § 603.003(b)(1). Performing the practice of perfusion includes "(A) administering: (i) pharmacological and therapeutic agents." *Id.* § 603.003(c)(4)(A)(i). The LPA also defines a "perfusion protocol" as a perfusion-related policy or protocol developed or approved by a licensed health facility or a physician through collaboration with administrators, licensed perfusionists, and other health professionals. *Id.* § 603.003(a)(2).

We hold that there was nothing on the face of the franchise agreement, or in the evidence before the court, that the infusion therapy services in question constituted the practice of medicine, therefore they were not in violation of the MPA. We reject the concept that just because a doctor can perform an act in the practice of medicine that

17

anyone else who performs the same act is necessarily also practicing medicine. For example, a doctor might administer an injection to a patient to treat a condition, and that would be done as part of his or her practice of medicine under the definition above. But, if the doctor orders a therapeutic injection for a patient to be given by a nurse, the nurse administers the injection in accordance with his or her licensure as a nurse.

Providing health care to people can involve many licensed professionals working together, oftentimes under one roof, and doctors are not responsible for every person in the employment of others who are collaboratively caring for common patients. *Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 585 (Tex. 1977) (holding that the "captain of the ship" doctrine is not recognized in Texas); *Methodist Hosp. v. German*, 369 S.W.3d 333, 342–43 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (noting that the MPA and NPA are complementary in character and that "[a]nything that could be characterized as the practice of medicine is expressly excluded from the scope of professional nursing in Texas as defined by the Nursing Practice Act"). Under this reasoning, what a licensed professional nurse does pursuant to his or her licensure, or a vocational nurse does under the supervision of a registered nurse, is not the practice of medicine merely because a physician could perform the same act. Administering the type of IV therapy envisioned by the franchise agreement under the orders and protocols of a physician is within the scope of nursing or the practice of a licensed perfusionist and is not the practice of medicine for such licensed persons.

This concept of complementary professional roles and rules in a collaborative health care setting was addressed by our Supreme Court in *Drs. Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 549 (Tex. 2016). There, the court noted,

> The Andrades nevertheless insist that Renaissance is in the business of providing medical care, relying on an interrogatory response and deposition testimony from Dr. Lozano that Renaissance offered obstetrical or labor and delivery services. These general statements do not create a fact issue as to whether the partnership's business includes providing medical care. Obstetrical services and labor and delivery services may fall under health care generally, *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10), without constituting medical care, *see id.* § 74.001(a)(19). *Renaissance, as the operator of a hospital, may be in the business of providing facilities, support staff, and supplies to assist doctors in the provision of medical care, without engaging in the illegal practice of medicine by a business entity.*

*Id.* (emphasis added).

That same analysis would apply here. Dr. Dill was Appellee's medical director who created protocols and standing orders for use by Appellee's employees providing infusion therapy. Those employees could legally provide those services under the auspices of their licensure pursuant to Dr. Dill's standing orders and protocols without "practicing medicine." Thus, there is nothing on the face of the franchise agreement that shows that it violates the MPA, and there is no evidence before the court demonstrating such illegality.[2] We therefore overrule Appellants' first issue.

---

[2]In their Post-Submission letter brief, Appellants direct the court's attention to Texas Occupations Code Section 157.001, which allows a physician to "delegate to a qualified and properly trained person acting under the physician's supervision any *medical act* that a reasonable and prudent physician would find *within the scope of sound medical judgment to delegate*." Tex. Occ. Code Ann. § 157.001. More specifically, they point

### c. Second Issue—Lack of Capacity

Appellants concede that CSF was a foreign entity not registered to do business in Texas at any time relevant to the trial court's adjudication of this dispute. As a result, CSF lacked capacity to bring its third-party claim. *See* Tex. Bus. Orgs. Code Ann. § 9.051(b). However, Appellants contend that Appellee waived this defense by not asserting it in a verified plea in abatement. As noted above, we reject this contention and overrule Appellants' issue that Appellee waived its capacity defense.

---

to Texas Occupations Code Section 157.0512 regarding physician supervision of advanced nurse practice nurses performing certain acts. Tex. Occ. Code Ann. § 157.0512. These arguments beg the question, i.e., is the act being delegated, thus requiring medical supervision, an act constituting the practice of medicine? Both the NPA and the court's opinion in *Methodist Hospital* tell us that nursing care by nurses does not include the practice of medicine, although a nurse can be delegated medical acts by a physician under certain circumstances. *See id.* § 301.002(2)(C)(G) (delegated medical acts separately from the "administration of a medication of treatment as ordered by a physician" in the list of nursing activities)). Second, Appellants argue in their post-submission brief that anyone who charges money for the service of treating a disorder or injury, by any method, is engaged in the practice of medicine. *See id.* § 151.002(a)(13). However, by definition, that only applies if the services for which charges are made constitute the practice of medicine. *Id.* As we stated above, acts done by a licensed professional nurse, vocational nurse, or perfusionist in accordance with his or her licensure is not the practice of medicine. Finally, Appellants argue in their post-submission brief that the practice of a vocational nurse must be performed under the supervision of a "registered nurse, physician, physician assistant, podiatrist, or dentist." *Id.* § 301.353. The NPA, of course, provides that vocational nursing is a part of "nursing" and is not the practice of medicine. *Id.* § 301.002(2), (4), (5). *Moreover, if vocational nursing is the practice of medicine, only physicians could supervise them, not registered nurses, physician assistants, podiatrists, or dentists.* Here, Appellee's staff included both registered nurses and vocational nurses.

20

Appellants contend that the trial court conflated capacity and standing by finding CSF lacked both capacity and standing because of its failure to register.[3] This was harmful according to Appellants because abatement would have been the proper remedy for lack of capacity. We agree that the trial court improperly conflated standing and capacity. However, because we disagree that abatement was the proper remedy for lack of capacity under these circumstances, we hold that the trial court did not abuse its discretion in entering a take-nothing judgment against CSF due to lack of capacity.

CSF was added as a party to this lawsuit via the "Defendant's First Amended Counterclaims and First Amended Third-Party Claims and Third-Party CSF Nutrition, LLC's Original Counterclaims and Original Third-Party Claims" filed on October 10, 2023. Appellee filed its "Second Amended Answer to Counterclaim and Third-Party

---

[3]Appellee also alleged that CSF was not a party to or beneficiary of the contract and therefore lacked standing and privity to assert claims against it. Lack of contractual privity may affect capacity, but it does not affect standing and, therefore, the court's jurisdiction. *McClane Champions, LLC v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 912 (Tex. 2023). Further, related to its argument that CSF was not a beneficiary of the franchise agreement, Appellee contends that CSF had no standing because (1) the trial court determined that Pipes had no claims against Vita 10, and thus "there can be no actional claim available to the purported principal of [Pipes]" and (2) "where the [t]rial [c]ourt found that Vita10 was not the proximate cause of damages claimed by Sneddeker, [Appellants] cannot extrapolate damages to Sneddeker's purported principal." This argument conflates standing with a decision on the merits. *See id.* (stating that a plaintiff does not lack standing merely because it may be prevented by some other principle from prevailing on the merits, and citing *Nat'l Health Res. Corp. v. TBF Fin., LLC*, 429 S.W.3d 125, 128–29 (Tex. App.—Dallas 2014, no pet.), for its statement that whether a party is entitled to sue on a contract is not truly a standing issue but a decision on the merits).

21

Claims, and Special Exceptions" on October 26, 2023, and that filing included Appellee's verified denial that CSF lacked capacity to sue because it is a foreign entity that is not registered to do business in Texas. By filing its verified denial of capacity to sue, Appellee shifted the burden to CSF to prove its capacity to sue. *JPMorgan Chase Bank, N.A.*, 508 S.W.3d at 409.

It is uncontroverted that CSF, even after Appellee filed its verified denial, did not register to do business in Texas prior to the conclusion of trial on February 26–27, 2024. Instead, Appellants contended that under Wyoming law (CSF's state of incorporation), Sneddeker, as CSF's agent, could pursue CSF's claim for its principal. Appellants maintained this position through trial. But, this position is in direct conflict with Section 9.051(b) of the Texas Business Organizations Code, which provides that

> (b) A foreign filing entity *or the entity's legal representative* may not maintain an action, suit, or proceeding in a court of this state, brought either directly by the entity or in the form of a derivative action in the entity's name, on a cause of action that arises out of the transaction of business in this state unless the foreign filing entity is registered in accordance with this chapter.

Tex. Bus. Orgs. Code Ann. § 9.051(b) (emphasis added). The trial court, after hearing all of the evidence, correctly ruled that CSF, directly or through its alleged agent, Sneddeker, lacked capacity to sue for CSF's alleged damages.

Further, the trial court did not abuse its discretion in rendering a take nothing judgment on CSF's claims due to lack of capacity given that the issue of capacity had been raised by a proper verified pleading and that CSF did not amend its pleadings or offer other proof to cure the capacity defect before the conclusion of the trial. *See Coastal*

*Liquids Transp., L.P.*, 46 S.W.3d at 886; *Graywest, LLC*, 2007 WL 614036, at *3. We overrule Appellants' second and third issues.

### d. Fourth Issue—Withdrawal of Partial Summary Judgment on Liability

Prior to trial, Appellants moved for partial summary judgment on their DTPA and TBOA claims against Appellee. At the pre-trial conference, the trial court stated that it had signed an order granting that motion. The order actually recites that the motion "should be granted as to liability" but did not actually grant any relief. In conjunction therewith, the court verbally confirmed on the record that, on those claims covered by the partial summary judgment Appellants would be presenting evidence just as to damages.

Thereafter, at the start of the trial, the trial court again orally confirmed that it would be signing an amended order on the partial summary judgment in favor of both Sneddeker and CSF. During opening statements, Appellants' counsel argued that the court had ruled in Appellants' favor on the DTPA and TBOA claims and that Appellants were entitled to their damages on those claims. Appellee's counsel confirmed in its opening statement that the court had rendered summary judgment for Appellants on the DTPA and TBOA claims but that there were causation issues for the jury to decide on damages, such as failure to mitigate, estoppel, unclean hands, and intervening or superseding causes. Thus, while the parties agreed that the partial summary judgment on "liability" had been granted by the court on the TBOA and

DTPA claims, there was a divergence on whether the only remaining question was the amount of damages or causation and amount of damages.[4]

On the second day of the trial, after hearing testimony from all four trial witnesses, the trial court announced that it had received an amended order granting Appellants' traditional motion for partial summary judgment initialed by counsel for both parties and that the court would sign the order and have it filed with the clerk. This amended order also recited that the motion "should be granted as to liability" but did not actually grant any relief.

After the trial concluded, the court issued its Final Judgment with its incorporated Memorandum, which states, under a heading reading "Ruling on [Appellants'] claims":

> Plaintiff breached the Texas Business Opportunity Act by failure to provide a disclosure statement with information in the form required by the Act; however[,] the Court finds that Defendants were provided information although not in the form of a disclosure statement.
>
> . . . In addition, the Court further finds that Plaintiff did not use a false, misleading, or deceptive act or practice.
>
> . . . The Court finds that the alleged actions of the Plaintiff were not the producing cause of damages claimed by the Defendant.

---

[4]By way of analogy, in a negligence action, while a default judgment admits to the "liability" portion of a plaintiff's claim, i.e., the fault and the causal nexus between the defendant's conduct and the event sued upon, it does not establish the causal nexus between that event and a plaintiff's unliquidated damages. *Viaso Transp. Sols., LLC v. Ancortex, Inc.*, No. 02-21-00262-CV, 2022 WL 1259059, at *3 (Tex. App.—Fort Worth Apr. 28, 2022, no pet.) (mem. op.).

The Final Judgment then awarded zero dollars to Appellants on their counterclaim and third-party claim. Further, the trial court awarded Appellee damages and attorney's fees for breach of the franchise agreement by Sneddeker. The Findings of Fact and Conclusions of Law signed after the Final Judgment had similar findings to those in the Memorandum incorporated into the Final Judgment.

Although the trial court did not expressly withdraw its ruling on the partial summary judgment ruling on liability on the TBOA and DTPA claims, Appellants contend that the trial court's Findings of Fact and Conclusions of Law and Final Judgment amount to an implicit withdrawal of its "grant" of summary judgment on liability in their favor. Appellants contend that their first notice of this "withdrawal" came with the court's Final Judgment and Memorandum, which were delivered to them after the bench trial had concluded. Therefore, Appellants argue that they were wrongfully precluded from offering any evidence in support of those claims during trial. *See Elder Constr., Inc. v. City of Colleyville*, 839 S.W.2d 91, 92 (Tex. 1992).

Regardless of the merits of this complaint, it was not preserved for appellate review. After receiving the trial court's Final Judgment and Memorandum, and its subsequent Findings of Fact and Conclusions of Law, Appellants filed no motion for new trial or other post-judgment motions bringing this complaint to the trial court's attention. Thus, this complaint was not preserved for appellate review. *See* Tex. R. App.

P. 33.1(a); *Lake*, 246 S.W.3d at 174; *Knox*, 1997 WL 51210, at *5.[5] We overrule

Appellants' fourth issue.

**IV.     Conclusion**

Having overruled all of Appellants' issues, we affirm the trial court's judgment.


/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  April 17, 2025

---

[5]Any alleged error arising from the trial court's "implied withdrawal" of its partial motion for traditional summary judgment for CSF is harmless in light of our affirmance of the trial court's take nothing judgment against CSF due to lack of capacity to sue. *See* Tex. R. App. P. 44.1.

26